Filed 9/30/21  In re L.W. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re L.W., a Person Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br>v.<br>M.S.,<br>        Defendant and Appellant. | A162234<br><br>(Marin County Super. Ct. No. JV26821A) |

        M.S. (Mother), mother of three-year-old L.W., appeals from the juvenile court's orders terminating her parental rights and selecting adoption as L.W.'s permanent plan, pursuant to Welfare and Institutions Code section 366.26.[1]  On appeal, Mother contends the court abused its discretion when it found that she had failed to establish the applicability of the parental benefit exception to adoption.  (See § 366.26, subd. (c)(1)(B)(i).)  We shall affirm the juvenile court's orders.

---

[1] All statutory references are to the Welfare and Institutions Code.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 13, 2019, Marin County Health and Human Service's Department of Children and Family Services (Department) filed an original petition pursuant to subdivisions (b) and (j) of section 300, alleging that then 16-month-old L.W. was at risk of suffering serious physical harm as a result of Mother's (1) failure to adequately protect and supervise L.W., and (2) inability to provide regular care for L.W. due to her extensive substance abuse history. The petition further alleged that L.W.'s half sibling had been abused and neglected, and that Mother's parental rights to him had been terminated in April 2017. The petition alleged that L.W. was also at substantial risk due to her father's (Father) failure to protect and supervise her.[2]

In a June 18, 2019 detention report, the social worker reported that the petition was based on an incident on June 11, in which sheriff's deputies arrested Mother for domestic violence and child endangerment after she reportedly held a knife to her own throat and threw knives at Father while holding L.W. in her arms. Mother also barricaded herself in her house during the incident. The social worker further reported that the Marin County Sheriff's Office had been called to the parents' address approximately nine times in the last year concerning issues that included Mother's suicidality, drug use, and verbal disturbances. The Department recommended that the court order L.W. detained.

At the June 18, 2019 detention hearing, the court ordered L.W. detained and also ordered supervised visitation.

---

[2] Father is not a party to this appeal, and he will be discussed only when relevant to any issue raised in Mother's appeal.

2

In the jurisdiction report filed on July 19, 2019, the social worker reported that she had met with Mother, who described herself as a " 'chronic relapser' " with drugs. Mother denied that she had held or threw knives or threatened suicide in the incident leading to the petition in the present case. Mother also said that she never kept drugs in the home, and kept her drug paraphernalia locked in her car. She admitted to leaving L.W. with Father for one to three nights at a time when she needed to "blow[] off steam" and use drugs.

On July 23, 2019, the court continued the jurisdiction hearing to the following month, for a joint jurisdiction/disposition hearing.

In a disposition report filed on August 15, 2019, the Department recommended that the court declare L.W. a dependent of the court, order six months of family reunification services, and adopt a proposed case plan that would provide Mother with treatment to enable her to maintain sobriety and address her mental health, and would also provide for regular visitation.

At the August 20, 2019 disposition hearing, Mother submitted on the Department's recommendations and the court sustained the petition with minor amendments, adjudged L.W. a dependent under section 300, subdivisions (b) and (j), and ordered reunification services and visitation.

In a six-month status review report filed on January 31, 2020, the Department recommended six more months of reunification services for Mother because she had made enough progress that there was a substantial probability that she would reunify with L.W. with six more months of services. The social worker reported that Mother had successfully completed an inpatient drug treatment program in September 2019, and had begun attending an outpatient treatment program in November. Mother had also consistently attended twice-weekly visits with L.W. during the reporting

3

period and had transitioned from fully supervised visits to check-in visits. The Department had considered transitioning to unsupervised visits several times, but each time Mother "would test positive for alcohol, miss tests, be unreachable by phone or email for 1-3 weeks, and/or once got kicked out of her intensive outpatient program." The social worker noted, however, that Mother never appeared to be under the influence of alcohol during visits, and that all visits were positive for L.W., with no safety threats.

At the March 10, 2020 six-month status review hearing, Mother submitted on the Department's recommendations and the court ordered six additional months of reunification services.

On June 29, 2020, the Department requested, and the court ordered, a continuance of the 12-month status review hearing from August 4 to September 15, based on the Department's need for additional time to expand and assess visitation before finalizing a recommendation of family maintenance services for Mother and L.W.

In a 12-month status review report filed on September 1, 2020, the Department recommended that the court terminate Mother's reunification services and set the matter for a section 366.26 hearing. The social worker reported that L.W., who had moved into a concurrent foster home on March 7, 2020, was on track developmentally, and had no medical or other major concerns. L.W. and Mother had continued to "have consistently positive visits with each other," and it was clear that Mother loved L.W. and had shown an ability to apply age appropriate parenting skills. The Department had therefore transitioned Mother to unsupervised visits with L.W. in late June. Until July, Mother attended all scheduled visits, except one she missed due to illness. However, immediately after the Department decided to transition the visits from check-in to unsupervised, Mother "largely stopped

4

responding to the [social worker], was almost discharged from her [outpatient] program for missing groups, therapy, and not checking in with her therapist, and . . . was almost discharged from her sober living home for leaving for several nights without permission. Additionally, [Mother] started missing visits with L.W., which she had never done before." Based on Mother's behavior and concerns about her sobriety and/or mental health, the Department changed the visits back to check-ins. Mother acknowledged her behavioral changes, but blamed them on " 'self-sabotaging.' " She denied that she had relapsed.

In a September 10, 2020 first addendum to the 12-month status review report, the social worker reported that on September 5, Mother had been arrested for misdemeanor battery following an incident of domestic violence with Father. Father had reported that Mother appeared to be under the influence of drugs at the time of the incident, and he suspected she had relapsed months earlier. Mother's sponsor, who visited Mother in jail on September 8, acknowledged to the social worker that she now believed Mother had been using drugs for several months.

In an October 1, 2020 second addendum to the 12-month status review report, the social worker reported that Mother, who had been discharged from her sober living home before her arrest, had begun living with sober friends after her release from jail. Her outpatient treatment program had discharged her following her relapse. Mother had attended only two visits with L.W. in the month of September, and "expressed a lot of guilt around her relapse and fear around the impact it could have on her reunification with" L.W. Mother's sponsor, with whom Mother was checking in daily, reported that Mother was experiencing significant mental health symptoms, including depression, anxiety, grief, and suicidal ideation.

5

At the October 7, 2020, 12-month review hearing, the court found that Mother had made minimal progress toward alleviating or mitigating the causes necessitating placement and that L.W. could not be returned safely to her care. It therefore terminated her reunification services and scheduled a section 366.26 selection and implementation hearing.

In its section 366.26 report filed on January 12, 2021, the Department recommended that the court terminate both parents' parental rights, and make adoption L.W.'s permanent plan. The social worker reported on Mother's visitation throughout the case. Specifically, between June 14, 2019 and February 17, 2020, Mother attended 59 out of 62 scheduled visits. Between February 18 and September 14, 2020, Mother attended 46 out of 48 scheduled visits. Between September 15 and December 29, 2020, after Mother's visits had been reduced to once or twice a month, Mother attended seven out of eight scheduled visits; however, no visits had been scheduled from November 3 to December 3 because Mother was not in contact with the Department.

In a February 18, 2021 first addendum to the section 336.26 report, the social worker reported that Mother had attended two out of three scheduled visits in the previous month. The Department had found that L.W., who was now three years old, was generally adoptable. She was "a charming and playful child" who was meeting all developmental milestones. She had "a loving and close relationship" with her prospective adoptive mother, who was "committed to [L.W.'s] well-being and love[d] her unconditionally." The social worker noted that L.W. had not been cared for by Mother for over half of her life, and opined that their relationship, which was "friendly but not parental in nature," did "not promote [L.W.'s] well-being to such a degree as to outweigh the well-being she would gain in an adoptive home."

6

The section 366.26 hearing took place on February 23, 2021. Mother testified that she and L.W. have a "special bond" and that L.W. would get excited when she saw Mother at the start of visits and would run up to her and jump into her arms. L.W. had called Mother "mommy" since she was 18 months old. They were very affectionate during visits and L.W. did not want the visits to end. Mother believed that it would be "cruel" to L.W. for her to suddenly not have Mother in her life, and that, because of their bond, it would not be in L.W.'s best interest to terminate Mother's parental rights.

At the conclusion of the section 366.26 hearing, the court found that L.W. was adoptable and that the parental benefit exception to adoption did not apply. The court terminated both parents' parental rights and ordered adoption as L.W.'s permanent plan.

On March 11, 2021, Mother filed a notice of appeal.

## DISCUSSION

Mother contends the court abused its discretion when it found that she had failed to establish the applicability of the parental benefit exception to adoption.

The purpose of the section 366.26 hearing is to select a permanent plan for the child after reunification efforts have failed. (§ 366.26, subd. (b); *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) When the court finds that a child is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless the parent shows, pursuant to one of the statutorily specified exceptions, "compelling reason[s] for determining that termination would be detrimental to the child . . . ." (§ 366.26, subd. (c)(1)(B); see *Caden C.*, at pp. 630–631.) " '[T]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' [Citation.]" (*Id.* at p. 631.)

7

At issue here is the parental benefit exception, which applies if the juvenile court finds by clear and convincing evidence that the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) In *Caden C.*, our Supreme Court described the "three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at p. 631.)

In *Caden C.*, the court also clarified the standards applicable to the review of a trial court's determination as to whether one of the statutory exceptions to adoption applies. (*Caden C., supra*, 11 Cal.5th at p. 639.) The court explained that the substantial evidence standard of review applies to the first two elements, and that, although the third element also has a factual component, "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [her] parent—is discretionary and properly reviewed for an abuse of discretion." (*Id.* at p. 640.)[3]

In the present case, Mother does not dispute that L.W. is adoptable or that her prospective adoptive parent intends to adopt her. She argues only that the court abused its discretion when it found that the parental benefit exception did not apply.

---

[3] The *Caden C.* court also observed, however, that "where, as with the parental-benefit exception, 'the appellate court will be evaluating the *factual basis* for an exercise of discretion, there likely will be no practical difference in the application of the two standards.' [Citations.]" (*Caden C., supra,* 11 Cal.5th at p. 641.)

At the conclusion of the section 366.26 hearing, the court addressed whether Mother had demonstrated the three elements necessary to prove applicability of the parental benefit exception. First, with respect to visitation, the court found that Mother's visits with L.W. were "frequent and continuous" between June 2019 and September 2020. "[H]owever, in September of 2020, Mother stopped visiting, she stopped confirming her visits. She stopped responding to the social worker, there were no visits at all for the month of November, and no contact form Mother during that time. Between September of 2020 and December of 2020, there were only seven visits, and since that time, . . . they reversed to supervised check-in visits, and they remained at this very limited amount due to that inconsistency. So, while Mother had very frequent and continuous contact at the beginning, it has not been the case since last fall."

Mother acknowledges that her relapse led to decreased visitation near the end of the dependency, but emphasizes that "the bond between them as demonstrated by frequent visits throughout the reunification period and the parent-child behaviors cannot be denied or discounted." Even assuming, as Mother claims, that her frequent visitation for most of the dependency period is sufficient to satisfy the first element of the parental benefit exception, the court also found that Mother did not have a significant parental bond with L.W. such that L.W. would benefit from continuing the relationship, noting that "[i]nteraction between a parent and child will always confer come incidental benefit." Substantial evidence supports the court's finding as to this element. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)

We recognize the love between Mother and L.W., as shown by the affection and enjoyment both demonstrated during visits. We also recognize Mother's patient and skilled supervision of L.W. during those visits, and her

9

openness to parenting suggestions. Nevertheless, considering that, at the time of the section 366.26 hearing, L.W. was only three years old and had been out of Mother's custody for over half of her young life, substantial evidence supports the court's finding that Mother had not shown that she occupied a significant parental role in L.W.'s life. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576; see also *In re C.F.* (2011) 193 Cal.App.4th 549, 555 ["A parent must show more than frequent and loving contact or pleasant visits"].)

Finally, even if Mother had demonstrated that L.W. has "a substantial, positive emotional attachment" to her such that L.W. "would benefit from continuing the relationship" (*Caden C.*, *supra*, 11 Cal.5th at p. 636), the court ultimately concluded it could "not find that the nature of the relationship described by Mother has risen to the level to overcome the benefits of that permanency." We review this determination for abuse of discretion. (See *id.* at p. 631.)

In exercising its discretion in each case, the court must "decide[] whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 633, quoting *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

Here, the record reflects that at the time of the section 366.26 hearing, L.W. had been living with her prospective adoptive parent for almost a year, which was nearly one-third of her life, and they had a loving, close relationship. The prospective adoptive parent gave L.W. "a sense of security

10

and reassurance," and was committed to adopting her.  In the circumstances of this case, we conclude the court acted well within its discretion when it determined that any potential harm to L.W. from the loss of her relationship with Mother was outweighed by " 'the security and the sense of belonging a new family would confer.' "  (*Caden C., supra*, 11 Cal.5th at p. 633; see § 366.26, subd. (c)(1)(B)(i).)

## DISPOSITION

The juvenile court's orders are affirmed.

 

                                    _____

                                    Kline, P.J.

We Concur:

_____

Richman, J.

_____

Stewart, J.

*In re L.W.* (A162234)